HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR
# THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| **MATTHEW BRACH,** an individual;<br>**JESSE PETRILLA,** an individual;<br>**LACEE BEAULIEU,** an individual;<br>**ERICA SEPHTON,** an individual;<br>**KENNETH FLEMING,** an individual;<br>**JOHN ZIEGLER,** an individual;<br>**ALISON WALSH,** an individual;<br>**ROGER HACKETT,** an individual;<br>**CHRISTINE RUIZ,** an individual; and<br>**Z.R.,** a minor;<br><br>Plaintiffs,<br>v.<br><br>**GAVIN NEWSOM,** in his official capacity as the Governor of California;<br>**XAVIER BECERRA,** in his official capacity as the Attorney General of | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |



1

Complaint                                                                 Case No.

California; **SONIA Y. ANGELL**, in her official capacity as the State Public Health Officer and Department of Public Health Director; and **TONY THURMOND**, in his official capacity as State Superintendent of Public Instruction and Director of Education

Defendants.

*Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is the principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.* – Chief Justice Earl Warren, *Brown v. Board of Education*, 347 U.S. 483, 491 (1954).

Plaintiffs Matthew Brach, Jesse Petrilla, Lacee Beaulieu, Erica Sephton, Kenneth Fleming, John Ziegler, Alison Walsh, Roger Hackett, Christine Ruiz, and her minor child, referred to by his initials, Z.R., by their attorneys, Dhillon Law Group, Inc., for their claims against Defendants Gavin Newsom, in his official capacity as the Governor of California; Xavier Becerra, in his official capacity as the Attorney General of California; Sonia Y. Angell, in her official capacity as the State Public Health Officer and Department of Public Health Director; Tony Thurmond, in his official capacity as

2



Complaint                                                                 Case No.

State Superintendent of Public Instruction and Director of Education, allege and show the Court as follows (this "Complaint").

## NATURE OF ACTION

1.      Defendants have ushered in a new wave of COVID-19 restrictions, this time barring in-person schooling for most children in California. In Defendants' rush to enact these new restrictions, they have placed politics ahead of the wellbeing of children, and children's important—indeed, fundamental—interest in receiving equal access to meaningful education. Defendants' arbitrary restrictions on in-person schooling effectively deprive Plaintiffs' children, and millions of other children across California, of the opportunity for meaningful education and the attendant hope for a brighter future.

2.      This Action presents facial and as-applied challenges to the Governor of California's May 4, 2020 Executive Order N-60-20 ("State Order"), attached here as **Exhibit 1**, which requires Californians to obey all State Public Health directives and orders, including the State's July 17, 2020 "COVID-19 Industry Guidance: School and School-Based Programs," attached here as **Exhibit 2**.

3.      This Action is brought pursuant to 42 U.S.C. § 1983, on the grounds that the State Order and associated guidance and directives, and Defendants' enforcement thereof, violate Plaintiffs' constitutionally and federally protected rights, including specifically: (1) the right to equal protection, free from arbitrary treatment by the State (U.S. Const. amend. XIV); (2) the right to procedural and substantive due process (U.S. Const. amend. XIV); (3) the right to be free from federally-funded state action resulting in a disparate impact on racial minorities (Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq.*); and (4) the right to equal and meaningful access to education, free from arbitrary state action resulting in a disparate impact on those with disabilities (Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*)).

3



Complaint                                                                                          Case No.

4.      With the school year commencing in mere weeks from the date of this filing, time is of the essence, and the Court should not hesitate to ensure that Plaintiffs' fundamental interests in securing a meaningful education for their children are preserved and protected from Defendants' arbitrary actions.

**JURISDICTION AND VENUE**

5.      This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' rights as secured by the U.S. Constitution and federal law. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

6.      The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which Defendants maintain offices, exercise their authority in their official capacities, and will enforce the State Order; and it is the District in which substantially all of the events giving rise to the claims occurred.

**PARTIES**

7.      Plaintiff Matthew Brach is a resident of Rancho Palos Verdes, California. He is suing in his individual capacity and not as an elected member of the Board of Education for the Palos Verdes Peninsula Unified School District. He is the father of two children. His sixteen-year-old son and thirteen-year-old daughter are students in the Palos Verdes Peninsula Unified School District. His son is entering his senior year and will suffer academically as a result of the denial of personal interaction with teachers and positive academic role models. His son's learning style requires him to be able to ask questions of and interact with his teachers and to learn collaboratively with peers. His daughter is already suffering emotionally from being isolated from her learning community.

4



Complaint                                                                                     Case No.

8.      Plaintiff Jess Petrilla is a resident of Mission Viejo, California. He has a son who is about to enter first grade. Last school year, when his son was in kindergarten and transitioned from in-classroom to distance learning, Petrilla noticed a significant decline in his discipline and engagement. His son's enthusiasm for learning declined, and his son became restless. Petrilla's wife has been forced to take time off of work in order to oversee her son's education. The Petrillas are concerned about the negative effects that this prolonged absence from the social aspects of structured education will have on the future development of their son.

9.      Plaintiff Lacee Beaulieu is a resident of La Jolla, California. She has two children, a daughter who is entering the ninth grade at a private school and a son who is about to enter 5th grade in the San Diego Unified School District. One of her biggest challenges with distance learning was trying to balance screen time. Her son's doctor has recommended that he not spend more than two hours a day in front of computer screens. With distance learning, this instruction has been almost impossible to honor. She is concerned that if her son is going to keep up academically, this could come at a cost of brain development issues as a result of him spending too much time in front of computer screens. She found it unrealistic to expect her son to follow the daily/weekly schedule on his own. If she was tied up with work, her son was unable to proceed with his daily lesson plans. While her daughter had more interaction with her teachers, because of the lack of labs, she was unable to properly do science experiments. Beaulieu believes that the increased screen time has had a negative affected on both of her children. She has noticed that they have difficulty with sleep schedules, both are depressed, and their discipline in completing school assignments has decreased. The enforced deprivation of personal contact with their peers has also affected these children negatively.

10.     Plaintiff Erica Sephton is a resident of Murrieta, California. She has a daughter who is about to enter transitional kindergarten at Saint Jeanne de Lestonnac Catholic school in Temecula. Sephton understands that her daughter needs social



Complaint                                                                                           Case No.

interaction with her fellow classmates, something that she cannot get at home doing distance learning. Sephton is aware of the risks of COVID-19 and believes that these minor risks for children do not outweigh the harm that her daughter is suffering by being deprived of her in-person education. While the school, the teachers and the students are ready to resume school instruction in the classroom with proper precautions, Sephton believes that they are being held back because of positive test results in other parts of the county and not because of any substantial risk in her community. She does not understand why her daughter is allowed to spend all day in a childcare facility, but cannot spend the same period of time in a private school, learning.

11.     Plaintiff Kenneth Fleming is the father of a public high school senior in Long Beach, California. His daughter has maintained straight A's on her report card for the last three years. She is a student athlete with ambition to earn a sports scholarship to attend her dream school.  Plaintiff Fleming is concerned that online-only education, which has not been awarding letter grades to students, adversely impacts his daughter's opportunity to compete for a college scholarship. He also believes that online-only education does not assist his daughter either athletically or academically in preparing for college.

12.     Plaintiff John Ziegler is a resident of Camarillo, California and is the father of an eight-year-old girl enrolled in public school. When her school moved from in-person instruction to an online platform during the Spring 2020 semester, her educational development suffered. She fell behind in her academic progress. As a result of the denial of in-person educational instruction, Plaintiff Ziegler's wife is left with no choice but to forgo her employment to stay home with their daughter.

13.     Plaintiff Alison Walsh is the mother of two children who were in the Capistrano Unified School District during the 2019-2020 school year. When CUSD moved to an online platform in the 2020 spring semester, her children's education suffered. Her children's school did not offer her children any live instruction. Their



Complaint                                                                                         Case No.

teachers merely sent work packets to the students to complete independently. In preparation for the 2020-2021 academic year, Plaintiff Walsh enrolled her children in private school to ensure that her children could receive academic instruction. Now with Defendants' guidance, even the private school is required to provide distance learning.

14.     Plaintiff Roger Hackett lives in Ventura County and has a son who will attend a private middle school in Westlake Village, California. His son's school has made significant preparations for safe in-person instruction pursuant to the CDC and local guidelines. This school is willing to offer both in-person and distance learning options based on the preference of the parents, and is ready to safely reopen in-school classes and non-contact athletics starting August 12. Plaintiff Hackett's concern is that online-only education will adversely impact his son's academic and social development. His son is frustrated by continual isolation from his academic community and absence from school athletics. Even though Westlake Village has very few COVID-19 positive cases, because it is in Los Angeles County which is on the state's watch list, this private school is being prevented from operating in compliance with COVID safety guidelines and in accordance with the desires of the school, teachers, parents, and students.

15.     Plaintiff Christine Ruiz is Hispanic and lives in Los Angeles County. She has two sons who attend public school in the county, one of whom is Plaintiff Z. R., referred to herein by his initials. Both boys have been diagnosed with autism. Her 15-year-old son, Z. R., attends high school, in moderate to severe special education classes. Under normal circumstances, he has an entire team of special needs educated, credentialed staff working hands on with him during the entire school day pursuant to an Individual Education Program ("IEP") mandated by law. As of March 16, 2020, he has received no services as mandated by his IEP. While the school offered a Zoom meeting, this did not work. Her younger son is in junior high school. He has been placed in mild to moderate special education classes. The online class only lasted about 30 minutes a day, and he did not learn anything by clicking a few links and watching a



Complaint                                                                                          Case No.

video. Her son is a hands-on learner. As a result of the school transitioning to online-only education and not providing the request IEP services, Ruiz has had to hire an educational tutor to assist her sons.

16.     Plaintiff Z. R. is a minor and, as such, is referred to herein by his initials. Z. R. is the 15-year-old son of Christine Ruiz who currently attends high school. Z. R. is Hispanic and takes moderate to severe special education classes as a result of his autism.

17.     Defendant Gavin Newsom ("Newsom") is made a party to this Action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom signed Executive Order N-60-20 (the "Executive Order") on May 4, 2020. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908).

18.     Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer in the State. Cal. Const. Art. V, § 13.

19.     Defendant Sonia Y. Angell, MD, MPH ("Dr. Angell") is made a party to this Action in her official capacity as the Director and State Public Health Officer. Dr. Angell is sued herein in her official capacity to the extent that she is responsible for providing official government guidance to the various industries that are allowed to operate.

20.     Defendant Tony Thurmond, ("Thurmond") is made a party to this Action in his official capacity as State Superintendent of Public Instruction and Director of Education. Thurmond is responsible for enforcing education law and regulations in California.

///
///

8



Complaint                                                                                   Case No.

**FACTUAL ALLEGATIONS**

21.    On or about March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of COVID-19.[1]

22.    On or about March 19, 2020, California Governor Newsom issued Executive Order N-33-20 in which he ordered "all residents are directed to immediate heed the current State public health directives."[2]

23.    On or about May 4, 2020, California Governor Newsom issued Executive Order N-60-20 in which he ordered "All residents are directed to continue to obey State public health directives, as made available at https//covid19.ca.gov/stay-home-except-for-essential needs/ and elsewhere as the State Public Health Officer may provide." Ex. 1.

24.    On July 17, 2020 Newsom announced a framework to reopening schools.[3]

25.    Under his plan, reopening hinges on not being on the county monitoring list for two weeks.[4]

26.    "Schools and school districts may reopen for in-person instruction at any time if they are located in a local health jurisdiction (LHJ) that has not been on the county monitoring list within the prior14 days."[5]

27.    The plan also includes a waiver procedure:

---

[1] Available as of the date of this filing: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

[2] Available as of the date of filing: https://www.gov.ca.gov/wp-content/uploads/2020/03/EO-N-33-20-COVID-19-HEALTH-ORDER-03.19.2020-002.pdf.

[3] Available as of the date of filing: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf.

[4] Available as of the date of filing: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf.

[5] *Id.*



Complaint                                                            Case No.

"A waiver of this criteria may be granted by the local health officer for elementary schools to open for in-person instruction. A waiver may only be granted if one is requested by the superintendent (or equivalent for charter or private schools), in consultation with labor, parent and community organizations. Local health officers must review local community epidemiological data, consider other public health interventions, and consult with CDPH when considering a waiver request."[6]

28.     California is the only state in the U.S. that is mandating at the state level that school districts not hold in-person classes, affecting millions of students, rather than leave that decision to the individual school district.[7]

29.     California Department of Public Health (CDPH) has provided guidance to similarly situated industries, namely camps[8] and childcare[9], allowing them to remain open, but guidance for schools[10] reveal that schools are subject to more stringent standards that defy reason.

30.     Currently, there are 32 counties on the watchlist.[11]

31.     There are currently 5.9 million students K-12 in California.[12]

---

[6] *Id.*
[7] Available as of the date of filing: https://thehill.com/homenews/state-watch/508105-heres-your-states-plan-for-reopening-schools.
[8] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-daycamps.pdf.
[9] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-childcare--en.pdf.
[10] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-schools.pdf.
[11] As of July 20, 2020, the following counties are on the watchlist: Alameda, Colusa, Contra Costa, Fresno, Glenn, Imperial, Kings, Los Angeles, Madera, Marin, Merced, Monterey, Napa, Orange, Placer, Riverside, Sacramento, San Benito, San Bernardino, San Diego, San Joaquin, San Luis Obispo, Santa Barbara, Santa Clara, San Francisco, Solano, Sonoma, Stanislaus, Sutter, Tulare, Yolo, Yuba, and Ventura. Available as of the date of filing: https://covid19.ca.gov/roadmap-counties/#track-data.
[12] Available as of the date of filing: https://lao.ca.gov/Education/EdBudget/Details/331.

10



Complaint                                                                                     Case No.

32.     As of July 14, 2020, there are 8,433 Child Care centers opened in the state of California and a total of 24,915 licensed Family Child Care Homes for a total of 33,348 total facilities.[13]

**Table 1: Total Number of Open Child Care Centers and Family Child Care Homes Statewide and by County (Data Retrieved: 7/14/2020)**

| County | Total Number of Open Facilities<br><br>Child Care Centers | Total Number of Open Facilities<br><br>Family Child Care Homes | Total Number of Open Facilities<br><br>All |
|---|---|---|---|
| Statewide | 8,433 | 24,915 | 33,348 |

## The U.S. Department of Education Is Encouraging Schools to Open

33.     During a July 8 briefing conducted by the Vice President and the coronavirus task force, the United States Secretary of Education, Betsy DeVos, stated "[t]here were a number of schools and districts across the country that did an awesome job of transitioning this spring. And there were a lot in which I and state school leaders were disappointed in that they didn't figure out how to continue to serve their students. Too many of them just gave up. The Center for Reinventing Public Education [CRPE] said that only 10 percent across the board provided any kind of real curriculum and instruction program."[14]

34.     The United States Department of Education spent approximately $8.3 billion on California K-12 schools for the 2019-2020 school year.[15]

35.     Not providing education for America's children is not a choice. "It would fail America's students, and it would fail taxpayers who pay high taxes for their education."[16]

---

[13] Available as of the date of filing: https://cdss.ca.gov/Portals/9/Additional-Resources/Research-and-Data/DSSDS/ChildCare-7-19.pdf.
[14] Available as of the date of filing: https://www.whitehouse.gov/briefings-statements/press-briefing-vice-president-pence-members-coronavirus-task-force-july-8-2020/.
[15] Available as of the date of filing: https://lao.ca.gov/Education/EdBudget/Details/331.
[16] *Id.*

Complaint                                                                    Case No.

36.     Devos also quotes The American Academy of Pediatrics, "Keeping schools closed 'places children and adolescents at considerable risk of morbidity and, in some cases, mortality.'"  The Pediatrics guidance concluded that everyone "should start with a goal of having students physically present in school."  "Fully open" and "fully operational" means that students need a full school year or more, and it's expected it will look different depending on where you are."[17] "Ultimately, it's not a matter of 'if' schools should reopen, it's simply a matter of 'how.'  They must fully open, and they must be fully operational."[18]

37.     CRPE found many disparities among schools.[19] In a new report involving a nationally representative sample of 477 school systems, statistical weights were applied to provide a nationally representative sample of U.S. school districts. CRPE was able to compare remote education in districts in different types of communities and with different student characteristics. The original cohort of districts followed showed increasing clarity and expectations for instruction, tracking student engagement, and progress monitoring. CRPE found a "sobering story… just one in three districts expect teachers to provide instruction, track student engagement, or monitor academic progress for all students… Far too many districts are leaving learning to chance during the coronavirus closures."[20]

38.     CRPE also notes, "[e]xperience tells us that low expectations for instruction bode poorly for the students who faced the greatest challenges: those in low-income households, those with disabilities, those who speak a language other than English at home."[21]

---

[17] *Id.*; full report available as of the date of filing: https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.
[18] *Id.*
[19] Available as of the day of filing: https://www.crpe.org/thelens/too-many-schools-leave-learning-chance-during-pandemic.
[20] *Id.*
[21] *Id.*



Complaint                                                                                     Case No.

39.     "Tracking student progress by collecting work for review, assessing students' progress toward academic benchmarks, or grading their work is the best way to gauge if students are continuing to learn in their remote settings. It may also be our only way to get a sense of gaps in students' learning that may emerge before the fall, when districts may be able to assess where students stand. Again, we found worrisome trends in the expectations districts set. Just 42 percent expect teachers to collect student work, grade it, and include it in final course grades for at least some students (typically those in middle and upper grades)."[22]

40.     The CRPE found a rural-urban divide. "This rural-urban divide in expectations is stark—far more so than the gap in instruction between districts with high concentrations of students who qualify for free or reduced-price lunch. When we divide the sample into quartiles based on the district's concentration of economically disadvantaged students, we do not see a clear divide between the districts with the highest and lowest quartiles in terms of expectations for instruction, tracking student engagement, or progress monitoring."[23]

41.     "More affluent school districts are more likely to require live video instruction from teachers. While expectations around synchronous, or real-time, teaching are uncommon across the board (expected in 21.8 percent of districts), only 14.5 percent of school districts with the highest concentration of students receiving free or reduced-price lunch expect teachers to provide live instruction. The most affluent 25 percent of districts in our sample are twice as likely to expect real-time teaching."[24]

42.     School closings also disproportionately affects minorities, as the NAACP notes.[25]

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Available as of the day of filing: https://naacp.org/coronavirus/coronavirus-impact-on-students-and-education-systems/



Complaint                                                                 Case No.

43.     "For students of color at all levels across the country, school closings create problems even more urgent than the interruption of their educations. Schools also serve as a community nexus for food and housing. Many Black students are eligible for the federal Free or Reduced-Price Lunch Program (FRPL). Fall 2016 data from the National Center on Education Statistics show that for high-poverty schools where more than 75% of students are eligible for FRPL, Blacks students accounted for 44% of those attending. At schools where 50-75% percent of students are eligible for FRLP, Black students made up 30% of the student population. For students who rely on their schools as a reliable source of daily meals, school closings leave a critical gap. The Secretary of Agriculture is granted waiver authority with respect to the student lunch law (under the Meals Act), including regarding nutritional content. This is a double-edged sword. It is important for the Secretary to be able to move quickly to get meals to students, including outside the school and in individual settings. Yet even here some guardrails must remain in place. We cannot go back to the days when ketchup counted as a vegetable for school lunches."[26]

### American Academy of Pediatrics Recommends Students Physically Present in Schools

44.     In late June, the American Academy of Pediatrics ("AAP") "strongly" recommended that "the coming school year should start with a goal of having students physical present in school."[27]

45.     The AAP noted the health benefits that would otherwise be lost such as "child . . . development," "social and emotional skills," "reliable nutrition," physical/speech and mental health therapy," and "opportunities for physical activity."[28]

---

[26] *Id.*

[27] American Academy of Pediatrics, *COVID-19 Planning Considerations: Guidance for School Reentry*, 3d para. (Last Updated June 25, 2020), https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.

[28] *Id.* at 1st para.

14



Complaint                                                                                       Case No.

46.     The AAP also noted that the lack of "in-person learning" could disproportionately affect minorities and those of less socioeconomic means.[29]

**Studies Show that Open Schools Present Minimal Risk**

47.      According to California's own published reports, not a single minor in the state of California has died as a result of COVID-19.[30]





48.     The CDC reports that children between the ages of 5 -17 are hospitalized at a rate of 5.3 per 100,000 compared to a national average of 113.6.[31]

49.     On March 30, 2020, the Australian Research Council released a study that looked at the early data from China, Singapore, South Korea, Japan, and Iran. The study concluded that while "SARS-CoV-2 can cause mild disease in children, the data

---

[29] *Id*.
[30] Available as of the date of filing: https://update.covid19.ca.gov.
[31] Available as of the date of filing: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html#hospitalizations

15



Complaint                                                                Case No.

available to date suggests that children have not played a substantive role in the intra-household transmission of SARS-CoV-2.[32]

50.     On April 26, 2020, another Australian study found *no* evidence of children infecting teachers.[33] The study concluded that the "spread of COVID-19 within NSW (New South Wales) schools has been very limited."[34] This study also found that unlike other respiratory viruses, children are not the primary drivers of the spread of COVID-19.[35]

51.     On May 18, 2020, during a video conference of ministers of education with the Council of the European Union, it was reported that since the reopening of schools in 22 member states, there had been no increase in infections of COVID-19 among students, teachers and parents.[36]

52.     On May 28, 2020, a study was released showing that there was no evidence of secondary transmission of COVID-19 from children attending school in Ireland.[37]

53.     On June 23, 2020, the Institute Pasteur after studying 1,340 people linked to primary schools in France released a study in which they found that infected children did not spread the virus to other children or to teachers or other school staff.[38]

---

[32] Available as of the date of filing: https://www.medrxiv.org/content/10.1101/2020.03.26.20044826v1.

[33] Available as of the date of filing: http://ncirs.org.au/sites/default/files/2020-04/NCIRS%20NSW%20Schools%20COVID_Summary_FINAL%20public_26%20April%202020.pdf, p. 4.

[34] *Id.*

[35] *Id.*

[36] Available as of the date of filing: https://www.washingtonexaminer.com/news/22-eu-member-states-have-not-seen-a-spike-in-coronavirus-cases-in-schools-after-reopening.

[37] Available as of the date of filing: https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2020.25.21.2000903#html_fulltext.

[38] Available as of the date of filing: https://www.pasteur.fr/fr/file/35404/download.



Complaint                                                                                          Case No.

54. On July 7, 2020, the Public Health Agency of Sweden published a study titled "Covid-19 in schoolchildren".[39] This study found:

    a. Closing of schools had no measurable effect on the number of cases of COVID-19 among children;

    b. Children are not a major risk group of the COVID-19 disease and seem to play a less important role from the transmission point of view, although more active surveillance and special studies such as school and household transmission studies are warranted; and

    c. The negative effects of closing schools must be weighed against the possible positive indirect effects it might have on the mitigation of the COVID-19 pandemic.

55. July 8, 2020, Prevent Epidemics published a report by the former head of the Centers for Disease Control and Prevention. In this report titled "Reopening America's Schools: A Public Health Approach" they found that the evidence "suggests that children may play a smaller role in transmission of COVID-19 than adults."[40]

56. On July 15, 2020, a study of 2,000 German school children was released that concluded that schools and young people do not play a significant role in the transmission of the coronavirus.[41] This study found that schools in Germany did not become hotspots after they were reopened.[42]

---

[39] Available as of the date of filing: https://www.folkhalsomyndigheten.se/contentassets/c1b78bffbfde4a7899eb0d8ffdb57b09/covid-19-school-aged-children.pdf.

[40] Available as of the date of filing: https://preventepidemics.org/wp-content/uploads/2020/07/Reopening-Americas-Schools_07-08-2020-Final.pdf, p. 6.

[41] U.S. News article available as of the date of filing at: https://www.washingtonexaminer.com/news/german-study-no-evidence-coronavirus-spreads-in-schools. Summary of study available in German as of the date of filing: https://tu-dresden.de/med/mf/die-fakultaet/newsuebersicht/immunisierungsgrad-geringer-als-erwartet-schulen-haben-sich-nicht-zu-hotspots-entwickelt.

[42] *Id.*



Complaint

Case No.

### Studies Show that the Digital Divide Harms Students

57.     Another study noted "there are many reasons to believe the COVID-19 impacts might be larger for children in poverty and children of color," citing (1) the disproportionately higher rate of COVID-19 infections and deaths and worse effect of the economic downturn on African American and Hispanic parents, and (2) the "digital divide in technology and internet access by race/ethnicity and socioeconomic status."[43]

58.     This digital divide is supported by surveys, such as one that showed that: (1) 41% of respondents stated that "not having a computer or tablet or enough available devices" was a "top barrier" to distance learning, while only 37% said that their child's school had lent mobile technology devices; and (2) 71% of African American families and 69% of families with a household income of less than $50,000 stating that lending mobile technology devices would be very helpful for families like theirs.[44] This survey comports with the "evidence that, even when teachers are making themselves and their instructional materials available virtually, many students lack the means to access online."[45]

59.     A Brown University study estimated those negative impacts on children to be a loss of 63-68% of the learning gains in reading relative to a typical school year and a loss of 37-50% in learning gains in math.[46]

60.     In some grades, students may come back close to a "full year behind in math."[47]

_____

[43] Kuhfeld *et al.* (May 2020) *Projecting the potential impacts of COVID-19 school closures on academic achievement*, p. 25 Annenberg Institute at Brown University, https://doi.org/10.26300/cdrv-yw05.

[44] The Education Trust-West, *California Parent Poll: COVID-19 and School Closures* (Accessed on June 19, 2020), available at: https://west.edtrust.org/ca-parent-poll-covid-19-and-school-closures/.

[45] Kuhfeld, *Projecting the potential impacts of COVID-19 school closures on academic achievement*, p. 10.

[46] *Id.* p. 23.

[47] *Id.*

18



Complaint                                                                                      Case No.

61.     The fact that this "digital divide" is a factor in the disproportionate effect of school shutdowns is even more troubling when data and anecdotal evidence show that remote learning encourages decreased teacher interaction with students.[48]

62.     Less than two weeks after the school shutdown on March 16, 2020, the Los Angeles School District officials admitted that 15,000 students are completely unaccounted for and more than 40,000 had not been in daily contact with their teachers.[49]

63.     Even among students from families with lower economic means who are provided with tablets and wifi hotspots, it has been reported that parents who are technically challenged have been unable to help their children get online. Teachers report children who are unable to respond online because they are babysitting their siblings, also home from school, while parents work to keep the family housed. Even the most diligent of teachers cannot provide extra attention to a struggling student in a class as they might in person.

### Student's Futures are Already Affected

64.     FAFSA (Free Application for Federal Student Aid) and college applications are down.[50] This certainly does not align with goals for college and preparing for future.

### Special Education Students are Disadvantaged by Distance Learning

65.     Under federal law, students with disabilities are guaranteed a Free,

---

[48] *Id.* at 10 "There are concerning signs that many teachers have had no contact at all with a significant portion of students . . . only 39% of teachers reported interacting with their students at least once a day, and most teacher-student communication occurred over email", and absenteeism.

[49] Howard Blume, *15,000 L.A. high school students are AWOL online, 40,000 fail to check in daily amid coronavirus closures*, LOS ANGELES TIMES, (March 30, 2020) Available at: https://www.latimes.com/california/story/2020-03-30/coronavirus-los-angeles-schools-15000-high-school-students-absent.

[50] Available as of the date of filing: https://www.fastweb.com/student-news/articles/coronavirus-impacts-fafsa-applications-college-enrollment.



Complaint                                                              Case No.

Appropriate Public Education (FAPE), as incorporated through the IDEA ACT 34 C.F.R. § 300.101and Title III of the Americans with Disabilities Act of 1990 ("ADA"), § 504 of the Rehabilitation Act of 1973.[51]

66.     The federal government allocates approximately $1.2 billion for California for special education each year.[52]

67.     Students with disabilities have been especially vulnerable to distance learning, as it is common for a student's individualized education program (IEP) to have individualized instruction, like a one-on-one aide, for example. When school are closed, it is difficult, and sometimes impossible to implement a student's IEP. Not following an IEP can cause grave consequences such as regression.

68.     Many parents of special needs children in California have reported that their children received none, or nearly none, of the individualized instruction guaranteed by law. Frustrated instructors simply gave up when faced with technology challenges, while others didn't try at all, and many school districts made zero provision for delivering these federally mandated services to children, despite the federal funding provided to the state for them.

69.     While not solely unique to students with disabilities, socialization in schools is critical for special needs children.

**Distance-Only Schools Pose Child Safety Concerns**

70.     As mandatory reporters, teachers who have daily contact with children are in the best position to notice and report suspected child abuse.

71.     Nationwide, "stay at home" does not mean "safe at home" as a report from RAINN (Rape, Abuse, & Incest National Network) describes. "Many minors are now quarantined at home with their abuser. Meanwhile, these kids are cut off from their safety net — the teachers, coaches, and friends' parents who are most likely to notice

---

[51] 20 U.S.C.A. § 1412; *see* 42 U.S.C.A. § 12132; *see* 29 USCA § 794.
[52] Available as of the date of filing:
https://lao.ca.gov/Publications/Report/4110#Introduction.



Complaint                                                                    Case No.

and report suspected abuse….As a result, abuse reports to many state authorities have declined — not because there is less abuse taking place, but because children have less contact with adults outside the home who could potentially spot and report abuse. Sadly, it is likely that the risk of children being sexually abused will increase as shelter-in-place orders continue — one more tragic consequence of the public health crisis the country currently faces."[53]

72.     Child abuse reports have also declined, but hospitals are reporting higher numbers – this is concerning because abuse is not being detected in time (i.e., before an abuse incident requiring hospitalization). In San Diego, during the months of April and May, 24 children were reported as being treated for abuse symptoms which is double what they normally see in the two-month period. Other locations have seen an increase, including Jacksonville, Florida (8 abusive head trauma cases in March and April instead of 3) and Fort Worth, Texas (9 severe cases at a hospital since March, when they usually only have 6 in the whole year).

**One California School District's Effort to Prepare to Open**

73.     As an elected member of the Palos Verdes Peninsula Unified School District ("PVPUSD") which is located in Los Angeles County, plaintiff Brach was active in the process of preparing the school district in reopening the schools.

74.     Brach was involved in preparing a "Return to School" survey.

75.     This survey found that over 60% of parents in the district believed that there was not enough face-to-face teaching time during the initial shutdown.

76.     Over 60% of parents also preferred that their children attend school in a normal in-person setting rather than return to the virtual learning program.

77.     Among teachers, over 60% of the teachers were comfortable with returning to teach school.

---

[53] Available as of the date of filing: https://www.rainn.org/news/first-time-ever-minors-make-half-visitors-national-sexual-assault-hotline



Complaint                                                                    Case No.

78.     The survey also showed that due to financial constraints, if the school did not return to in-person setting, over 7% of parents of TK – 5th grade children and over 19% of parents of parents of children between 6th - 12th grade would have to leave their children home without supervision.

79.     PVPUSD established a reopening committee that included staff, medical professionals and parents.

80.     PVPUSD was prepared to implement screening including providing a digital app so parents could answer questions each morning regarding symptoms, and the school was prepared to take students' temperature to verify the app's data.

81.     PVPUSD also was prepared to implement the following mitigation strategy:

    a.  Staggered arrival times;

    b.  Designated entrance and exit routes;

    c.  Purchase no touch thermometers and handle the logistics of temp taking to align with the number of thermometers;

    d.  Procure masks including N95 masks for nurses and cloth masks for students;

    e.  Provide water filling stations as no ability to use drinking fountains;

    f.  Provide grab/go meals for lunch;

    g.  Plexiglas for serving and cashier stations;

    h.  Investigation of HVAC system to support air circulation if windows had to be closed;

    i.  Order signage for directional guides and handwashing reminders;

    j.  Handwashing stations with foot pedal;

    k.  Install touch free sanitizing;

    l.  Instituted protocols for high touch areas.

82.     PVPUSD was ready to work with the teachers, parents, and students to provide options. The 60% of teachers and parents who wanted in-person learning were going to be able to choose that option while the other remainder could continue their learning with virtual study.

22



Complaint                                                                                          Case No.

**Newsom's Doomsday Predictions Have Not Proven True**

83.     Governor Newsom's rationale for Executive Order N-33-20, his original shelter in place order was to "bend the curve."[54] He stated that "[i]n some parts of our state, our case rate is doubling every four days," and that "[t]he point of the stay at home order is to make those numbers moot."[55]  The Governor added that one goal was to slowdown transmission enough to reduce the strain it might place on hospital resources.[56]

84.     California only accounts for five point three percent (5.3%) of the nation's COVID-19 deaths while containing twelve percent (12%) of the nation's populace.[57]

85.     Governor Newsom cited a model showing that as of March 19, 2020, 56 percent of Californians, or more than 25 million people, could be infected over the next eight weeks.[58]

86.     Contrastingly, several infectious disease experts, including Professor of Epidemiology John P.A. Ioannidis of Stanford University, called this an extreme, worst-case scenario that was unlikely to happen – and they turned out to be correct.[59]

87.     Upon information and belief, another piece of flawed data that drove California's and Santa Clara County's original, onerous shelter-in-place orders was an

---

[54] March 19, 2020 press briefing at 35:17-36:00, available as of the date of filing at https://www.youtube.com/watch?v=8OeyeK8-S5o.
[55] *Id*.
[56] *Id*. at 5:42-8:09.
[57] According to the CDC, California has 6,823 of the United States' 128,035 COVID-19 deaths. Available as of the date of filing at https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.  According to the U.S. Census, California has 39,512,223 of the United States' 328,239,523 people. Available as of date of filing at https://www.census.gov/quickfacts/fact/table/CA,US/PST045219.
[58] *Id*. at 5:00-6:00.
[59] *Newsom: 56 % of Californians Could Get Coronavirus If Nothing Is Done*, San Francisco Chronicle, March 19, 2020, available as of May 3, 2020 at: https://webcache.googleusercontent.com/search?q=cache:sokxG9_b-2oJ:https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php+&cd=1&hl=en&ct=clnk&gl=us.

23



Complaint                                                                                   Case No.

incorrect assumption that the $R_0$ of COVID-19 was 5.7.

88.     The "R-naught" is the rate at which people can be infected, or more precisely the rate of reproduction of the virus as measured by infected human hosts.[60]

89.     Upon information and belief, part of the data that the Governor depended on for his claim—of 25 million infections in California within eight weeks—during his March 19, 2020 announcement was the initial rate of infection in Wuhan, the originating epicenter of COVID-19.  Then and there, the numbers apparently showed a $R_0$ of 5.7.[61]

90.     However, now, the $R_0$ of COVID-19 without mitigation efforts is understood to be approximately 2.2-2.7.[62] With mitigation efforts, the $R_0$ of COVID-19 has been drive further down.

91.     More egregiously, the COVID-19 death rate projections model on which Governor Newsom relied for implementing a state of emergency and mass quarantine of healthy Californians, turned out to be grossly flawed.[63]

92.     Governor Newsom's inexplicable restrictions on school reopening is not based in scientific facts, and is completely arbitrary especially in light of the fact that California allows all of the functional components of schools allowed in camps and childcare. More fundamentally, the school closing "plan" is no plan at all, and ignores the state's legal duties to California's children.

///

///

---

[60] https://www.nytimes.com/2020/04/23/world/europe/coronavirus-R0-explainer.html.
[61] Available as of the date of filing: https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.
[62] Id.
[63] Available as of the date of filing: https://www.statnews.com/2020/04/17/influential-covid-19-model-uses-flawed-methods-shouldnt-guide-policies-critics-say/.

24



Complaint                                                                                              Case No.

## CLAIMS

### FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Violation of the Equal Protection Clause

### Arbitrary School Closures

### (By All Plaintiffs Against All Defendants)

93.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

94.     The equal protection doctrine prohibits "governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 601 (2008) (citations omitted). The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974).

95.     The framework for reopening schools facially, and as-applied, arbitrarily treats Plaintiffs' children (and other minors attending public and private schools) differently from those in nearby school districts; those in childcare; and those attending summer camps, even though all such children and their families are all similarly situated.

96.     The risk of exposure or transmission within in any particular county is substantially the same whether children are at school, daycare, or at camp, yet only schools are subject to arbitrarily mandated closures. Children at summer camp, daycare, and in school will be in the presence of other children, in an enclosed space, overseen by an older person(s) not comprised of the child's family unit, for an extended period, and industry guidance issued for schools, camps, and daycare, contains the same or essentially the same protocols for wearing face coverings, physically distancing, hygiene, cleaning, arrival/departure procedures, sharing, checking for signs and symptoms and notification procedures if a child or staff member becomes ill.

97.     Defendants' mandates arbitrarily restrict access to schools based on the location of the school. Children residing in any particular county, including those

25

Complaint                                                          Case No.

counties in which Defendants have forcibly shut down in-person instruction, may still attend private school in nearby counties, despite the differing levels of risk or exposure to the virus, further revealing the arbitrary nature of Defendants' treatment of Plaintiffs and all others who rely on the public school system.

98.     There is no rational basis—much less any compelling reason—for allowing Defendants' arbitrary treatment of schools, which are vital to children's development, and are subject to more severe restrictions and potentially outright closure. Moreover, apt and less restrictive alternatives to Defendants' closure regime exist, such as requiring schools to *enable* distanced learning over the internet, without imposing Defendants' overbearing, one-size-fits-all regime.

99.     Defendants intentionally, discriminatorily, and arbitrarily imposed restrictions on the reopening of schools in violation of Plaintiffs' right to equal protection under the law.

100.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their and/or their children's constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order and associated guidance documents which restrict the reopening of schools in a manner that violates the Equal Protection Clause.

101.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order and any associated guidance documents.

102.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

///

///



Complaint                                                                                              Case No.

1
2
3
4

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Violation of Due Process**

**Deprivation of Liberty Without Procedural Due Process of Law**

**(By All Plaintiffs against All Defendants)**

5       103.    Plaintiffs incorporate herein by reference each and every allegation
6  contained in the preceding paragraphs of this Complaint as though fully set forth herein

7       104.    The Due Process Clause of the Fourteenth Amendment provides that no
8  state shall "deprive any person of life, liberty, or property, without due process of law."
9  U.S. Const. amend XIV. Plaintiffs and their children have a liberty interest in their right
10 to equal access to basic minimum education and in their rights secured by the California
11 Constitution and state law, which includes the right to an education, Cal. Const. art. IX,
12 § 1 ("[a] general diffusion of knowledge and intelligence [is] . . . essential to the
13 preservation of the rights and liberties of the people…."); *O'Connell v. Superior Court*,
14 141 Cal. App. 4th 1452, 1482 (2006) (students possess a constitutional right to "equal
15 access to a public education system that will teach them the skills they need to succeed
16 as productive members of modern society."); *Butt v. State of California*, 4 Cal. 4th 668,
17 681 (1992) ("education is a "uniquely fundamental personal interest in California");
18 *Serrano v. Priest*, 5 Cal. 3d 584, 589 (1971) ("the right to an education in our public
19 schools is a fundamental interest …") and (2) their right to contract freely, without
20 impairment by the State, with private schools for the education of their children. U.S.
21 Const., art. I, § 10; Cal. Const. art. I, § 9.

22       105.    Defendants deprive Plaintiffs and/or their children of these rights and
23 liberties without due process of law, in violation of the Fourteenth Amendment to the
24 U.S. Constitution, by (1) mandating distanced-learning in most circumstances, which
25 effectively provides no or unequal access to education; and by (2) substantially
26 impairing Plaintiffs' ability to contractually obligate schools to complete the in-person
27 instruction of their children that the state refuses to provide.

28       106.    The State Order and Defendants' enforcement thereof violate Plaintiffs'

27



Complaint                                                                                      Case No.

procedural due process rights because (1) Defendants lack any legal authority to issue or enforce the State Order and associate guidance, and therefore deprive Plaintiffs of liberties without any process whatsoever, and (2) Defendants fail to specify standards or protocols applicable to requests for a waiver from compliance with Defendants' orders.

107.    Defendants have no authority under either the California Constitution nor any law adopted by the legislature to deprive Plaintiffs or their children of their right to receive an education or to be free of the State's substantial impairment of contracts— indeed, rights are themselves protected by the California Constitution, U.S. Constitution, and fundamental law;

108.    California law makes clear that "No state agency shall issue . . . any guideline . . . unless the guideline . . . has been adopted as a regulation filed with the Secretary of State . . . ." Cal. Gov. Code § 11340.5(a).

109.    Nowhere in the California Emergency Services Act, does it give the Governor the authority to suspend the constitutional rights of Californians or to suspend California statutes. Instead, Cal. Gov. Code §§ 8567, 8571, and 8627 only permit the governor to suspend "regulations" and that these orders must be in writing. However, the Governor has misused his Emergency Powers to mandate that any violation of the State public health directives results in a fine not to exceed $1,000 or by imprisonment not to exceed six months. Cal. Gov. Code §8665.

110.    In California, a regulation that has not been adopted in compliance with the Administrative Procedure Act is deemed an Underground Regulation and is invalid. *See Modesto City Schools v. Education Audits Appeal Panel*, 123 Cal.App.4th 1365, 1381 (2004). California is one of the few states that requires rulemaking procedure for the adoption of guidance documents. California Practice Guide: Administrative Law 25:45, by Rutter Group.

111.    Defendant Sonia Y. Angell is not an elected official. However, Defendant Newsom has effectively given Defendant Angell the ability to govern the state of California by guidance shutting down businesses and schools, in the latter case with one

28



Complaint                                                                                          Case No.

stroke of the pen dooming millions of California children to no meaningful education, inadequate education, no provision of special needs instruction, and a myriad of health and safety risks.

112.    Governor Newsom has been impermissibly delegating executive authority to the Public Health Agency, who in turn has been issuing directives, under the guise of law, with criminal penalties associated for not following order.

113.    The non-descript waiver process referenced in materials issued by the California Department of Public Health is vague and subject to arbitrary enforcement and implementation: "A waiver may only be granted if one is a requested by the superintendent (or equivalent for charter or private schools), in consultation with labor, parent and community organizations. Local health officers must review local community epidemiological data, consider other public health interventions, and consult with CDPH when considering a waiver request."[64] Defendants provide no standards by which local health officers are to assess, approve, or reject such waiver requests. What does "in consultation with" mean? Californians are left to guess.

114.    As such, Plaintiffs and the public lack any meaningful opportunity to seek redress of injuries caused by Defendants' mandates or by which they may seek to reopen schools based on evidence of changing circumstances, recent research, or the availability of healthcare or health practices to mitigate risks associated with the virus.

115.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order and associated guidance.

116.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order and associated guidance.

---

[64] Available as of date of filing:
https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf.



Complaint                                                                          Case No.

117.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Due Process
### Deprivation of Substantive Due Process of Law
### (By All Plaintiffs against All Defendants)

118.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein

119.    The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. Plaintiffs and their children have a liberty interest in their right to equal access to basic minimum education and in their rights secured by the California Constitution and state law, which includes the right to an education, Cal. Const. art. IX, § 1 ("[a] general diffusion of knowledge and intelligence [is] . . . essential to the preservation of the rights and liberties of the people…."); *O'Connell v. Superior Court*, 141 Cal. App. 4th 1452, 1482 (2006) (students possess a constitutional right to "equal access to a public education system that will teach them the skills they need to succeed as productive members of modern society."); *Butt v. State of California*, 4 Cal. 4th 668, 681 (1992) ("education is a "uniquely fundamental personal interest in California"); *Serrano v. Priest*, 5 Cal. 3d 584, 589 (1971) ("the right to an education in our public schools is a fundamental interest …") and (2) their right to contract freely, without impairment by the State, with private schools for the education of their children. U.S. Const., art. I, § 10; Cal. Const. art. I, § 9.

120.    Defendants deprive Plaintiffs and their children of these rights and liberties without due process of law, in violation of the Fourteenth Amendment to the U.S. Constitution, by (1) mandating distanced-learning in most circumstances, which effectively provides no or unequal access to education; and by (2) substantially



Complaint                                                                                          Case No.

1   impairing Plaintiffs' ability to contractually obligate private schools to complete the in-

2   person instruction of their children that the state refuses to provide.

3       121.    The State Order and Defendants' enforcement thereof violate Plaintiff's

4   substantive due process rights as follows:

5           a.    fundamental law and the California Constitution entitles Plaintiffs

6   and their children equal access to a basic minimum education.

7           b.    the U.S. Constitution entitles Plaintiffs to be free of substantial

8   impairment from the state of their ability to obligate educational institutions to instruct

9   their children by operation of contract law;

10          c.    Defendants lack any legitimate, rational, or compelling interest for

11  depriving Plaintiffs' children of their right to an education.

12          d.    even if such a legitimate interest existed, the State Order and

13  associated guidance is neither rationally related nor narrowly tailored to further any

14  such interest.

15      122.    Plaintiffs have no adequate remedy at law and will suffer serious and

16  irreparable harm to their constitutional rights unless Defendants are enjoined from

17  implementing and enforcing the State Order and associated guidance.

18      123.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

19  declaratory relief and temporary, preliminary, and permanent injunctive relief

20  invalidating and restraining enforcement of the State Order and associated guidance.

21      124.    Plaintiffs found it necessary to engage the services of private counsel to

22  vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

23  attorneys' fees pursuant to 42 U.S.C. § 1988.

24

25

26

27  ///

28  ///



31

Complaint                                                                    Case No.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Violation of Title VI of Civil Rights Act of 1964**

**Disparate Impact on Racial Minorities**

**(By Christine Ruiz and Z. R. Against All Defendants)**

125.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

126.   Federal law conveys to Plaintiffs the right to be free from enforcement of facially discriminatory laws, facially neutral laws adopted with discriminatory intent or purpose, and facially neutral laws causing a disparate impact on racial minorities with regard to federally funded public programs, including California's public schools. 42 U.S.C. 2000d, *et seq.* (Title VI of the Civil Rights Act of 1964). Section 1983, in turn, creates a private right of action against the deprivation of such federal rights against officials acting under color of state law, despite there being no private right of action under a disparate impact theory pursuant to Title VI itself. *See* 42 U.S.C. § 1983; *Alexander v. Sandoval*, 532 U.S. 275, 300 (2001) (Stevens, J., dissenting) ("[l]itigants who in the future wish to enforce the Title VI [disparate impact] regulations against state actors in all likelihood must only reference § 1983 to obtain relief.")

127.   Mandatory distance learning facially, and as-applied here, creates a negative, disparate impact on racial minorities, including Plaintiff Christine Ruiz and her son, Z. R., who are Hispanic. Public policy research has confirmed that racial minorities rely more heavily on educational opportunities for gaining equal socioeconomic footing when compared to their non-minority counterparts, occasionally resulting in an increased need for educational services.[65] Racial minorities are therefore disproportionally required to devote greater resources to provide themselves and their

---

[65] See, e.g., https://calmatters.org/explainers/achievement-gap-california-explainer-schools-education-disparities-explained/; https://www.npr.org/2019/02/26/696794821/why-white-school-districts-have-so-much-more-money.



Complaint                                                                 Case No.

children with the same educational opportunities available to their counterparts – this phenomenon is known as the "education gap."

128.    Defendants have acted arbitrarily and with deliberate indifference toward the unduly harsh effects their school restrictions have on Plaintiffs Ruiz and Z. R. and all others racial minorities who must devote additional or unique resources to implement meaningful at-home instruction when compared with non-minorities.

129.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing their broad prohibitions on in-person education in California.

130.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order.

131.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Federal Disability Rights
### Failure to Provide Equal Educational Access to Disabled Students
### (By Plaintiffs Christine Ruiz and Z. R. against All Defendants)

132.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

133.    Federal law provides Plaintiffs Ruiz and Z. R., along with all other disabled families and children in California the right to free appropriate public education, individualized education plans conferring meaningful educational benefit, appropriate evaluation, and the right to be free from discrimination on the basis of any disability, including through the exclusion from or deprivation of equal access to the

33



Complaint                                                                              Case No.

educational opportunities. *See* 20 U.S.C. § 1400, *et seq.* (Individuals with Disabilities Education Act ("IDEA")); 42 U.S.C.A. § 12131, *et seq.*, (Title II of the Americans with Disabilities Act of 1990 ("ADA")); 29 U.S.C. § 794, *et seq.*, (Section 504 of the Rehabilitation Act of 1973).

134. Defendants' arbitrarily imposed restrictions on the reopening of schools, including the forced closure of many public and private schools, deprives Plaintiffs Ruiz and Z. R. of these rights, which are secured by the above-cited federal laws.

135. Defendants act knowingly, recklessly, and with deliberate indifference to the rights of Plaintiffs Ruiz and Z. R., and their children, and all other disabled children, by forcibly restricting most private and public schools in California from providing meaningful educational opportunities commensurate with their obligations under federal law.

136. Plaintiffs Ruiz and Z. R. have no adequate remedy at law and will suffer serious and irreparable harm in the form of the deprivation of educational access and other educational and non-discrimination rights secured by federal law, unless Defendants are enjoined from implementing and enforcing the school closure.

137. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order and any associated guidance.

138. Plaintiffs Ruiz and Z. R. found it necessary to engage the services of private counsel to vindicate their rights under the law. They are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

- An order and judgment declaring that the State Order and the associated guidance, facially and as-applied to Plaintiffs, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S.



Complaint                                                                 Case No.

Constitution; Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d, *et seq.*); the Individuals with Disabilities Education Act (20 U.S.C. § 1400, *et seq.*); Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131, *et seq.*); and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, *et seq.*), and that Plaintiffs' children should be allowed in-person instruction without delay;

- An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the State Order or otherwise interfering with Plaintiffs' constitutional rights and federal guarantees;
- For attorneys' fees and costs;
- Such other and further relief as the Court deems appropriate and just.

Date: July 21, 2020                    DHILLON LAW GROUP INC.

By:  /s/ Harmeet K. Dhillon
Harmeet K. Dhillon
Mark P. Meuser
Gregory R. Michael

Attorneys for Plaintiffs



35

Complaint                                                                 Case No.